U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed March 22, 2013**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TEXAS STAR REFRESHMENTS, LLC, | § | CASE NO. 11-50367-rlj-11 |
| | § | |
| DEBTOR. | § | |
| | § | |
| IN RE: | § | |
| | § | |
| RODNEY WAYNE WILSON and | § | CASE NO. 11-50396-rlj-11 |
| DONNA LYNN WILSON, | § | |
| | § | |
| DEBTORS. | § | |

## MEMORANDUM OPINION

On October 17, and October 29, 2012, hearing was held on the chapter 11 plans, as

amended, of related debtors Texas Star Refreshments, LLC and Rodney Wayne and Donna Lynn

Wilson [Docket No. 113, Case No. 11-50367; Docket No. 88, Case No. 11-50396].  Creditor

Custom Food Group, LP objects to confirmation of both plans.  For purposes of this

Memorandum Opinion, Texas Star Refreshments, LLC will be referred to as "**TSR**," and Rodney

Wayne and Donna Lynn Wilson will be referred to as the "**Wilsons**"; the plan of TSR will be

referred to as the "**TSR Plan**" and the Wilsons' plan will be referred to as the "**Wilson Plan**."

Custom Food Group, LP will be referred to as "**CFG**."  Other abbreviated names are either identified or are apparent in context.

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The following constitutes the Court's findings of fact and conclusions of law in accordance with Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

### **Statement of Facts**

**A.**    **The TSR Plan**

1.       TSR filed this chapter 11 case on September 21, 2011.  It filed the *Debtors' Second Amended Plan of Reorganization* on October 1, 2012.  The TSR Plan provides that administrative claims, consisting of attorneys' fees, a reclamation claim, and a small ad valorem tax claim, are generally satisfied in full by payments made upon the effective date of confirmation, which is 30 days after entry of an order confirming the TSR Plan.  *See Debtor's Disclosure Statement* [Docket No. 84, Case No. 11-50367] at 2.  An additional $2,000 per month is projected to be paid to TSR's counsel, Mr. Bass, for a period of 12 months post-confirmation.[1]

2.       The major secured creditor of TSR, First Bank and Trust ("**First Bank**"), held a secured claim at the time of filing of approximately $619,395.  TSR was one payment in arrears to First Bank at the time of filing; it has, since the filing, made regular monthly payments of $11,934.23.  At the time of the confirmation hearing, First Bank's claim had been paid down to approximately $482,868.  The TSR Plan provides for payment of First Bank's claim with interest at 5.25% for seven years and 84 monthly payments of $6,881.68.  First Bank retains its liens on

---

[1]Mr. Bass was paid a $30,000 retainer for services provided to TSR in this bankruptcy case.  Of this, $5,289 was paid to Mr. Bass to cover prepetition services and the filing fee.

essentially all of TSR's assets; its liens also cover the interests in TSR held by its owners, Rodney Wilson, David Rogers, and Mike Harris. First Bank's claim is further secured by personal guaranties by TSR's owners—Wilson, Rogers, and Harris—as well as a guaranty from the Small Business Administration ("SBA").[2]

3. TSR has separately classified CFG. CFG has an unsecured claim of $921,754.91. The TSR Plan recites that "[t]hough evidenced by [a] Final Judgment and secured by a Judgment Lien, in fact the claim as a practical matter is unsecured in that Texas Star has no assets that are unencumbered, and its assets that are encumbered are not worth more than the debt against them (they secure the claim of First Bank and Trust)." *Debtors' Second Amended Plan of Reorganization* [Docket No. 113, Case No. 11-50367-11] at 3. The TSR Plan provides that CFG's claim will be paid in full. Its claim bears interest at 5% per annum and is payable as follows: 12 monthly payments of $6,000 each, followed by 71 monthly payments of $10,310.98 each, and a final balloon payment, in the 84th month, in the estimated amount of $352,873.65 "or the entire amount of principal and accrued interest remaining to be paid on the claim." *Id.* at 4. The TSR Plan further provides that CFG's claim shall be secured by a "senior security interest in and to the stock and equity interest owned in TSR post-confirmation by Rodney Wilson (20%), David Rogers (20%), and Mike Harris (20%)." *Id*.

4. Concerning the pledge of the stock interests, the TSR Plan explains that Wilson, Rogers, and Harris each owned 33 1/3% of the outstanding interests. Their respective interests are reduced to 20% each under the TSR Plan based on the contribution of capital and equipment made by a new equity participant, David Hilliard, in return for a 40% interest in the

---

[2]The SBA guaranty was alternatively referred to as a guaranty of 80% of the indebtedness and of 90% of the indebtedness.

company.

5.      The other unsecured creditors (other than CFG) are designated as Class 4 under the TSR Plan; they are likewise paid in full but without a balloon payment. Such claims, which total approximately $79,300, accrue interest at 5% and are paid in 120 monthly installments of $841.48 each. The Class 4 unsecured creditors are as follows: Bimbo Bakeries in the amount of $1,037.40, Coca Cola Refreshments in the amount of $45,619.40, Vistar Corporation in the amount of $24,241.02, and Pepsi Bottling Company in the amount of $8,438.65, for a total amount of $79,336.47.

**B.      The Wilson Plan**

6.      The Wilson Plan is dependent upon the TSR Plan. Rodney Wilson serves as the on-site manager of TSR and takes care of its day-to-day operations. His wife, Donna Lynn Wilson, serves as his assistant. The TSR Plan provides that Rodney Wilson will be paid an annual salary of $85,000 and Donna Wilson an annual salary of $15,000; the Wilson Plan states that Rodney's net wages each month will be $5,250 and Donna's will be $1,000. The Wilson Plan also provides that Donna contributes income from social security of $1,400 per month and from a "retirement" account of $275 per month. The Wilson Plan simply provides that the Wilsons will pay or continue to service their personal expenses with the Internal Revenue Service, Lubbock Central Appraisal District, Santander (which financed their cars), and Wells Fargo Mortgage (which has the mortgage on their home). The Wilson Plan states that total unsecured creditors are in the approximate amount of $983,137.73, which includes approximately $910,000 as an estimated amount of the claim of CFG. CFG's claim against the Wilsons personally derives from the same judgment referenced in the TSR Plan. The Wilson Plan provides that they will dedicate

- 4 -

their "net projected disposable income" to the unsecured class, Class 5 under their plan, and distributions will be made to creditors through a disbursing agent on a pro rata basis. Payments will be made in semi-annual installments for four years, beginning on the date of the first payment, which is due six months after confirmation of the Wilson Plan.

7.     As set forth above concerning the TSR Plan, Rodney Wilson is a guarantor of the TSR debt to First Bank. The Wilson Plan recognizes this and classifies First Bank under Class 7 of the Wilson Plan. The Wilson Plan provides as follows:

> So long as Texas Star Refreshment, the primary borrower, is servicing the loan pursuant to terms agreed to between Texas Star Refreshment and FB&T, the Debtors will not make any payments to FB&T. When and if Texas Star Refreshment defaults on the loan to FB&T, the Debtors will pay one percent (1.0%) of the balance owing on the note (at the time such and any default occurs) over a 5 year period at zero interest in 5 equal payments, the first payment being made one month after the default occurs and the remaining 4 payments being made on the same date of the 4 subsequent years.

*Debtors' Revision to the Second Amended Combined Plan and Disclosure Statement* [Docket No. 88, Case No. 11-50396-11] at 12.

8.     The Wilsons themselves, as owners of their assets, constitute Class 8 under the Wilson Plan. The Wilson Plan allows them to retain all of their property, subject to § 1129(a)(15) of the Bankruptcy Code.

9.     The budget for the Wilsons that was submitted in support of the Wilson Plan is simple: their net monthly income is projected as $7,925, which arises principally from salary payments made by TSR to the Wilsons; with monthly living expenses of $4,161. They therefore provide for plan payments to Santander and Wells Fargo of $2,879 per month, an $83.33 per month fee to the disbursing agent, and a projected monthly net disposable income payment of $801.67. This projects to a payout of just over $41,000 against unsecured claims, the vast

majority of which (94%) will be allocated to CFG.

**C.     Balloting**

      10.    The following creditors cast ballots on the TSR Plan:

- Class 1 (Administrative Claims): Vistar Corporation and Lubbock Central Appraisal District each accepted the TSR Plan; no votes were cast rejecting the TSR Plan.
- Class 2 (First Bank): The bank voted to accept the TSR Plan.
- Class 3 (CFG): CFG rejected the TSR Plan.
- Class 4 (General Unsecured Creditors): Vistar Corporation accepted the TSR Plan on its unsecured claim; it was the only unsecured creditor that cast a ballot on the TSR Plan.
- Class 5 (Insider Creditors): This class consists of the claim of insider Rodney W. Wilson.  According to the report of balloting, his vote as that of an insider was not counted for acceptance purposes.
- Class 6 (Unexpired Leases): This class consists of the claim of Avenue P RV Storage & Warehouse, which accepted the TSR Plan.
- Class 7 (Equity Interests): This class consists of the claim of equity interest owners Rodney Wilson, David Rogers, and Mike Harris.  David Rogers cast a ballot accepting the TSR Plan.

      11.    The following creditors cast ballots on the Wilson Plan:

- Class 1 (Priority Claim of the Internal Revenue Service): No ballot was cast by the IRS.
- Class 2 (Priority Claim of Lubbock Central Appraisal District): Lubbock Central Appraisal District accepted the Wilson Plan.
- Class 3 (Secured Claim of Santander): Santander did not vote.
- Class 4 (Secured Claim of Wells Fargo Home Mortgage): Wells Fargo did not vote.
- Class 5 (Unsecured Creditors): Vistar Corporation in the amount of $52,896.34 and K. Narendran, M.D. in the amount of $487.99 each voted to accept the Wilson Plan; Discover Bank in the amount of $3,590.08 and CFG in the amount of $923,167.49 each voted to reject the Wilson Plan.

**D.     Other Relevant Facts**

***The CFG Lawsuit and Judgment***

      12.    The Wilsons were both previously employed by CFG and, according to their

Disclosure Statement, have been employed in the soft drink and vending industry for decades.  In 2009, while still employed by CFG, Rodney Wilson, along with the two other partners, applied for an SBA guaranteed loan, with First Bank as the lender, to start a "full line vending and office coffee company."  The loan was approved in February 2010, at which time the Wilsons resigned their positions with CFG.  The new company, TSR, began operations in April 2010.

13.     In May 2010, CFG sued TSR and the Wilsons seeking damages and injunctive relief.  The suit was filed in the 237th Judicial District Court of Lubbock County, Texas, seeking damages for (1) misappropriation of trade secrets, (2) breach of fiduciary duty, (3) conversion, (4) unjust enrichment, (5) conspiracy to misappropriate trade secrets, (6) conspiracy to breach fiduciary duties, (7) conspiracy to commit conversion, (8) tortious interference with a contract, and (9) tortious interference with prospective business relations.  After a jury trial, verdict was issued in favor of CFG.  Specifically, the jury found that (1) TSR and the Wilsons misappropriated CFG's trade secrets; (2) the Wilsons owed fiduciary duties to CFG and breached them; (3) TSR and the Wilsons unlawfully converted CFG's personal property; (4) TSR and the Wilsons intentionally interfered with CFG's contracts with its customers; (5) TSR and the Wilsons intentionally interfered with CFG's prospective business relations; (6) TSR and the Wilsons conspired to commit these unlawful acts; and (7) TSR and the Wilsons obtained a benefit from CFG by fraud, duress, or the taking of undue advantage.  CFG was thereby awarded a judgment of approximately $910,000.  CFG was denied any injunctive relief, however.

14.     As a result of the verdict, TSR filed under chapter 11 of the Bankruptcy Code on September 21, 2011, and the Wilsons filed individually on October 4, 2011.

15.     As stated, CFG was not awarded injunctive relief and thus TSR was not prohibited

- 7 -

or enjoined from continuing its business operations.

### *TSR's Operations*

16. TSR's business is described as a full-line vending business providing coffee, soft drinks, water, and snacks to "outlets" that have many employees or customer traffic. Such outlets include public facilities and hospitals.

17. TSR stocks and services vending machines as needed; some of the machines are owned by TSR and some are owned by the particular company that provides the product, Coca Cola or Pepsi Cola, for example.

18. At the time TSR filed its bankruptcy case, it was one payment in arrears to its secured creditor, First Bank. It has made all regular required payments to First Bank since the filing of the bankruptcy case. TSR has remained current on all post-petition expenses—bills, wages, taxes, etc.—and has filed all required reports with the Court.

19. The four creditors that make up the Class 4 unsecured creditors in the TSR case—Bimbo Bakeries, Coca Cola Refreshments, Vistar Corporation, and Pepsi Bottling Company—are each major trade suppliers of product to TSR. As such, TSR's survival is dependent on maintaining good business relations with them. CFG, on the other hand, is a competitor to TSR; both companies have customers in the same trade group and area.

20. The Wilsons manage the day-to-day operations of TSR. David Rogers and Mike Harris are not involved in the day-to-day operations.

21. Rodney Wilson testified that the value of TSR's assets is well less than the debt owed to First Bank.

22. Wilson is listed as a creditor of TSR in the amount of $60,000. He testified that

this sum arises from $30,000 he paid to the attorneys that represented TSR (and presumably the Wilsons) in connection with the CFG lawsuit, and $30,000 advanced to cover post-filing operating expenses. Wilson testified that he and his wife sold a home in Ruidoso, New Mexico to raise the $60,000.

23.      Each of the three original investors—Wilson, Rogers, and Harris—put in $55,000 for their one-third interest in TSR. Rogers and Harris are generally described as passive investors in TSR.

24.      Rogers is a successful homebuilder in Lubbock, Texas. He has a long-time banking relationship with First Bank. He is a member of the Business Development Board of the bank, which is a group of business bank customers that meet on a regular basis and serve to help the bank gain access to other potential business investors.

25.      As noted under the TSR Plan, Rogers is a guarantor of First Bank's loan to TSR. He is also a stockholder in First Bank, though he testified that his stock represents a less-than 1% interest in the bank. Rogers testified that he has sufficient assets to payoff First Bank's loan to TSR.

26.      Harris, like Rogers, is a passive investor in TSR, in the sense that he is not involved in the day-to-day management operations of the company. Harris lives in New Braunfels, Texas. Harris worked for CFG from 1999 to 2007 and then again in late 2008 through early 2009. He first became aware of the "TSR opportunity" in October 2009; he had left CFG earlier that year. He has also guaranteed the First Bank loan to TSR. Harris is particularly familiar and experienced in the vending business as he served as a regional manager for CFG, covering an area that included six divisions and numerous physical locations.

27.     For the period of January 2012 through August 2012, TSR generated approximately $86,700 of net income, net of operating expenses.  After subtracting its payments to First Bank, it netted approximately $10,000 during this period.

28.     During the late stages of this bankruptcy proceeding, prior to the confirmation hearing, TSR added two large accounts, one of which is a major hospital in Lubbock, Texas. Wilson and Harris estimate that the latter account will generate an additional $600,000 in revenues for the company.  The impact of these two accounts has obviously not yet been realized. Both accounts, though generating significant additional revenue, will also saddle TSR with higher commission rates than TSR typically has to pay to its customers.  This is partly offset, however, by TSR's ability to charge a higher price for the product subject of these two accounts.

29.     David Swiney testified as an expert on behalf of CFG.  Swiney is a Certified Valuation Analyst and a Certified Fraud Examiner.  He holds a Bachelors of Business Administration in Finance from the University of Missouri and a Masters of Business Administration from Texas A&M University.  He is presently a principal with KPMG, LLP with 22 years of experience.  Swiney concluded that TSR has consistently failed to meet historical operating projections, that its "historic results" make it unlikely that TSR will be able to make the payments called for by the TSR Plan, and that, under the TSR Plan, CFG will not receive the present value of its claim that resulted from the state court judgment.

30.     Swiney concludes that TSR will end up in a $12,854 negative cash position at the end of the first year under the TSR Plan.  In contrast, TSR projects it will net an excess of $56,800.  Swiney and the TSR projections are premised upon the same projected revenue of $2,155,093 and the same plan payments.  They do not point to a difference in TSR's operating

expenses. The difference lies, however, in the respective conclusions concerning net income available with which to make plan payments. TSR's projections project gross profits of $1,172,503.32 with net income, after expenses, of $255,223.56, or 11.87% of projected revenues. Swiney simply uses a historic profit margin of 8.6% against projected revenues of $2,155,093 to arrive at net income of $185,577. This approximate $70,000 difference (between $255,223.56 and $185,577) results in Swiney's negative cash amount of $12,854 after subtracting projected plan payments.

31.    TSR projects that its available cash will drop slightly at the end of the second year of the TSR Plan and then will increase somewhat each year thereafter.

32.    There is no real dispute concerning the feasibility of the Wilson Plan. So long as the Wilsons receive their salaries from TSR, they should be able to make the payments called for under their plan. By way of summary, their projected monthly income will be $7,925; their expenses will be $4,161 per month, with plan payments to secured creditors—Santander and Wells Fargo—of $2,879. After paying the disbursing agent fee, they project monthly net disposable income to creditors of $801.67 per month, of which the vast majority goes to CFG as holder of 94% of the unsecured claims.

33.    CFG, relative to TSR, is a much larger company. It is a closely held company with Wendell Holloway and Marguerite Hoffman each owning 50% of the company. Holloway testified that he purchased his 50% interest from Ms. Hoffman for approximately $20 million. CFG had annual gross sales of a high of $96 million and a recent low of $65 million.

34.    In September 2011, the Wilsons sold a home they owned in Ruidoso, New Mexico to Donna Wilson's mother for $130,000; they netted approximately $127,000 to $128,000 on the

sale.  Rodney Wilson testified that of the net proceeds, $30,000 was loaned to TSR; $30,000 was

paid as a retainer to TSR's bankruptcy counsel, Mr. Bass; $30,000 was paid as a retainer to the

Wilsons' personal bankruptcy counsel, Mr. Tarbox; and $30,000 was paid to counsel for TSR and

the Wilsons on the CFG lawsuit, Mr. Grady Terrill.  There is no evidence that the Ruidoso house

sold for less than fair value.

35.     For the period of March 2011 through May 2011, the Wilsons' personal bank

account maintained a balance of $28,000 to $30,000.  The CFG judgment was issued on May 31,

2011; immediately thereafter, in early June 2011, the Wilsons made two $10,000 withdrawals

from their personal account.

36.     The Wilsons had $12,000 of cash on hand at the time they filed their chapter 11

bankruptcy case; they also had approximately $4,100 on deposit in checking and savings

accounts.

## Discussion

CFG contends that the TSR Plan has not been proposed in good faith, § 1129(a)(3); that it

is not feasible, § 1129(a)(11); and that TSR has failed to obtain acceptance from an impaired class

that does not include a vote of an insider, § 1129(a)(10).  On the § 1129(a)(10) objection, CFG

submits that First Bank is an insider from the ownership interest held by David Rogers in both

TSR and First Bank.  These objections, if successful, foreclose consideration of the TSR Plan

under § 1129(b), the so-called "cramdown" provision, because TSR would have failed to satisfy

all applicable § 1129(a) requirements other than § 1129(a)(8) (acceptance by all classes or no

impairment of any class), which is a condition to proceeding under § 1129(b).  *See* 11 U.S.C. §

1129(b)(1).  If TSR is determined to have satisfied all applicable § 1129(a) requirements, except §

1129(a)(8), CFG contends that the TSR Plan is not fair and equitable as to CFG as the dissenting

- 12 -

class.  CFG submits that the TSR Plan unfairly discriminates against it and that the proposed

deferred payments, with a balloon payment, do not provide it with the present value of its claim as

required under § 1129(b)(2)(B).

Concerning the Wilson Plan, CFG contends that it fails to satisfy the so-called "best

interest of creditors test," § 1129(a)(2), as CFG will not receive what it would receive under a

chapter 7 liquidation; and, regardless, even if the Wilson Plan is determined to satisfy such

provision, as well as the other § 1129(a) requirements, save (a)(8), it clearly fails to meet the

"absolute priority rule" as embodied within the fair and equitable standard of § 1129(b).

**A.      Confirmation of the TSR Plan**

The Wilson Plan is dependent upon confirmation of the TSR Plan: TSR serves as the

source of compensation for the Wilsons.  The TSR Plan is not, however, dependent upon

confirmation of the Wilson Plan.  The Court will therefore first address whether the TSR Plan

satisfies the confirmation requirements of § 1129 of the Bankruptcy Code.  In doing so, the Court

addresses the provisions under dispute.  As for the balance of the § 1129(a) requirements, the

Court is satisfied that all other applicable requirements are met and does not specifically address

same.

**1.  *Good Faith***

Good faith has different requirements throughout the Bankruptcy Code.  *See* Edith H.

Jones, *The "Good Faith" Requirement in Bankruptcy*, 1988 Ann. Surv. Bankr. L. 2, 5 (1988).  A

bankruptcy court reviews the circumstances surrounding the filing and the behavior of the debtor

during the course of the bankruptcy proceedings to determine if the *filing* was made in good faith.

*See id.* at 8.  Filing motivations typically found to lack good faith include avoiding other

- 13 -

judgments, litigation, or foreclosure; or circumventing, for example, obligations under a contract or bond. *See id.* at 3–4. In contrast, a good faith evaluation of a proposed plan requires an evaluation of the plan itself. *In re Tex. Extrusion Corp.*, 68 B.R. 712, 723 (N.D. Tex. 1986).

> The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start. Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.

*In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (internal citations omitted). The sitting bankruptcy judge is in the "best position to assess the good faith of the parties' proposals." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).

A plan proposed in good faith must have reorganization as its honest and legitimate purpose. *See In re Block Shim Dev. Co.–Irving*, 118 B.R. 450, 455-56 (N.D. Tex. 1990). The court considers circumstances surrounding the plan to assess the "subjective motive" of debtors and plan proponents. *See id.* Courts do not consider prepetition actions when assessing the good faith of a proposed plan. *See Tex. Extrusion*, 68 B.R. at 723.[3] Prepetition actions are immaterial to whether the proposed plan is consistent with the objectives of the Bankruptcy Code and the likelihood of the plan's success. *See id.* (finding that allegations regarding prepetition violations of antitrust law had no impact on assessing the good faith of the proposed chapter 11 plan). Additionally, certain post-petition actions of the debtor may be discounted by the court when evaluating whether a plan has been proposed in good faith. *See* Richard M. Cieri, *et al.*, *"The Long and Winding Road": The Standards to Confirm a Plan of Reorganization Under Chapter*

---

[3]Even when challenging the legality of the proposed plan under § 1129(a)(3), this court refused to look to acts or evidence prior to the filing of bankruptcy. *See Tex. Extrusion Corp.*, 68 B.R. at 723.

*11 of the Bankruptcy Code (Part I)*, 3 J. Bankr. L. & Prac. 3, 37 (1993) (discussing debtors' actions that the Fifth Circuit has declined to find lacking good faith, including the following: decreasing other partner's ownership interests, using cramdown, discounting payments to creditor, and including terms inconsistent with prior agreed order in proposed plan); *see also In re Vill. at Camp Bowie I, L.P.*, 454 B.R. 702, 709 (Bankr. N.D. Tex. 2011) (applying the § 1129(a)(3) good faith analysis to determine that artificial impairment of a class is not a per se failure of good faith).

CFG's good faith objection is based on the judgment it obtained in state court. CFG argues that, in effect, these bankruptcy proceedings are illegitimate and the plans before the Court are tainted by the conduct of TSR—particularly through the Wilsons and the other "insiders," including First Bank—that resulted in the jury's verdict in the state court suit. CFG contends that TSR misappropriated CFG's assets, thus making CFG an involuntary lender, with confirmation of the TSR Plan effectively allowing TSR to continue the misappropriation.

A bankruptcy filing in response to an adverse state court judgment, especially a judgment of the nature of the one here, raises good faith concerns, both in connection with the filing of a bankruptcy case and with a chapter 11 plan. *See* 7 Collier on Bankruptcy ¶ 1129.02[3][a][B] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). But the TSR Plan proposes to repay *in full* the CFG judgment, with interest at the rate provided for in the judgment. While the motives for the bankruptcy itself can be debated, the TSR Plan is not only a "plan" of survival, it is also a plan that meets the rehabilitative purposes of chapter 11 and, in the process, provides for full payment of TSR's creditors.

CFG complains of the plan treating First Bank more favorably than it does CFG and

favoring Rogers as a guarantor of the First Bank indebtedness. This objection is rooted in frustration. First Bank is a secured creditor; CFG is an unsecured creditor. The Code recognizes a secured creditor's interest in estate property. First Bank, apart from its ostensibly friendly relationship with Rogers and its allegedly favorable treatment of TSR, has greater leverage. First Bank can hardly be criticized for agreeing to modifications to its loan that have enhanced the ability of TSR to go forward under a confirmed plan. The Court is not aware of any requirement on First Bank's part to seek recovery on Rogers's guaranty rather than against TSR and its (First Bank's) collateral. Besides, this case concerns approval of a plan that addresses TSR's creditors; the rights of First Bank against Rogers are not before the Court. The mere fact that First Bank has recourse against Rogers and is also protected, at least in part, by an SBA guaranty of the indebtedness does not make its cooperation conspiratorial.

TSR was not enjoined from continuing its business. It has submitted a plan that assumes its continued operations and has proposed to pay all its creditors, including CFG, in full. The basis for the CFG judgment does not, under the circumstances here, dictate that *any* plan of TSR would be proposed in bad faith; it also does not mean that any plan *must* meet with CFG's approval. The Court questions whether this latter goal is even possible. In light of TSR's proposal, as reflected by its plan, neither TSR's bankruptcy filing nor its plan is proposed in bad faith. The TSR Plan, at least on its face, seeks to achieve a result that is consistent with the Bankruptcy Code.

## 2. *Acceptance By Impaired Class*

CFG next contends, and correctly so, that the TSR Plan fails to satisfy the § 1129(a)(8) requirement of acceptance or non-impairment of all classes of creditors. This alone does not

defeat confirmation, however, as a debtor may seek confirmation under § 1129(b) as to a dissenting class provided all other applicable requirements of § 1129(a) are met. *See* 11 U.S.C. § 1129(b).

CFG submits that the TSR Plan has not been accepted by a non-insider, impaired class as required under § 1129(a)(10). This is incorrect. First Bank has accepted the TSR Plan; its claim is impaired under the TSR Plan, which is not disputed. First Bank is not an insider, despite CFG's contention that it is. CFG's argument that First Bank is an insider is premised upon its application of the Bankruptcy Code's definition of "insider" and "affiliate" and the applicability of such definitions to Rogers's ownership in both TSR and First Bank. Section 101(31) of the Bankruptcy Code states that the term "insider" includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E). The term affiliate is defined at § 101(2) to include an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(A). First Bank is not an affiliate. Rogers meets the definition of affiliate as he owns more than 20% of TSR. But First Bank is not an affiliate of Rogers; the definition does not so apply, and CFG's analysis does not follow from the statute.

CFG submits that insofar as § 1129(a) is concerned, TSR fails to satisfy § 1129(a)(10), which requires acceptance by at least one class that is impaired. As just explained, this provision is satisfied by First Bank's acceptance. It is also on its face satisfied by the acceptance of the Class 4 General Unsecured Creditor class. CFG contends such acceptance should not be counted because, it argues, the TSR Plan's classification of unsecured creditors and CFG in two separate classes was done to gerrymander the votes to obtain an accepting class. The charge of

gerrymandering fails in part because TSR has, as explained, obtained acceptance of First Bank. In addition, CFG does not contend that its classification separate from other unsecured creditors was improper under § 1122(a) of the Bankruptcy Code, the provision that specifically addresses classification of claims. On this point, the Court is satisfied, regardless, that the plan's classification scheme is proper. The Class 4 creditors are TSR's trade vendors, those creditors that are critical to its continued operations. CFG on the other hand is obviously a competitor to TSR. CFG has not, within the context of any of its objections, raised a scenario by which it will be paid *any* of its judgment by TSR. TSR does not have the ability to simply payoff CFG. It does not have the ability, as a still somewhat fledgling company that is already significantly leveraged, to obtain financing to payoff CFG. Its assets are entirely encumbered. If its plan fails, the likely scenario is liquidation, in which case CFG recovers nothing on account of its judgment. In short, CFG's position reveals that its real desire and indeed the way in which it benefits the most is by TSR's liquidation. Now, given the judgment it obtained, CFG essentially argues that TSR should not be given an opportunity to reorganize. CFG's interest is therefore different from that of other unsecured creditors, who have approved of the TSR Plan given it provides for payment in full of their claims. TSR's trade vendors, in addition, have an interest in continuing to sell their products to TSR, just as TSR has a business need to continue purchasing their products. The separate classification of trade vendors from CFG is reasonable and proper. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 113–14 (Bankr. N.D. Tex. 2002) (*citing In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993)); *see also In re Premier Network Servs., Inc.*, 333 B.R. 130 (Bankr. N.D. Tex. 2005). "A non-creditor interest can justify separate classification if it gives [the creditor] 'a different stake in the future viability' of [the debtor] that may cause it to

vote for reasons other than its economic interest in the claim." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011). CFG's objections and its vote disavow a sincere interest in collecting some or all of its claim.

The Court notes further that such separate classification has clearly not been made as a means to mistreat CFG. Though the plan calls for a balloon payment in the 84th month, after approximately two-thirds of the claim has been paid, such term is significantly shorter than the 120-month term provided for the Class 4 trade creditors. Moreover, CFG will be "secured" by 60% of the stock in TSR. While its value is presently questionable, it may well increase in value as TSR pays down its debt to First Bank as lienholder against its assets. More important, the potential loss of such interest from CFG's foreclosure in the event of default serves to incentivise the principals and management of TSR to ensure that TSR maintains its obligation to CFG.

The final issue under § 1129(a) concerns the requirement of feasibility, the § 1129(a)(11) requirement. The Court is satisfied that the preponderance of the evidence establishes that there is a "reasonable possibility that a successful rehabilitation [of TSR] can be accomplished within a reasonable period of time." *In re Geijsel*, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012). The TSR Plan is "not likely to be followed by . . . liquidation, or the need for further financial reorganization." *Id*. (citations omitted).

TSR is a going concern. Its business prospects have improved significantly since formation; it continued in a relatively successful fashion during the pendency of these bankruptcy proceedings. Needless to say, it survived the state court litigation, as well. TSR's business should continue to grow, especially in light of recent large accounts that it has obtained. It has capable management that is experienced in the vending business.

- 19 -

### 3. *Feasibility*

The determination of the feasibility of any small business debtor is somewhat speculative, especially in the latter years under consideration and subject of the plan. This raises the obvious concern regarding its ability to pay the CFG balloon on the 84th month as the plan provides. A balloon cannot be created solely as a means to put-off an inevitable failure. The payment here, however, dovetails with completion of payments to First Bank, and at a time at which CFG's judgment has been significantly paid down. Both these factors are important in the Court's conclusion regarding TSR's ability to pay the balloon. Simply stated, TSR will have its assets freed-up, and it will have survived while making major inroads into paying off its largest unsecured creditor. It should then be in a favorable position to refinance and payoff CFG.

Whether the TSR Plan is feasible is a difficult and close call, but, on balance, the Court concludes that the TSR Plan is feasible and satisfies § 1129(a)(11) of the Bankruptcy Code.

### 4. *"Cramdown": Section 1129(b)*

Having considered the TSR Plan and determined that TSR has met all applicable requirements of § 1129(a), save § 1129(a)(8), the Court considers whether the TSR Plan satisfies § 1129(b) of the Bankruptcy Code, the so-called "cramdown" provision. Under § 1129(b), a plan's treatment of a dissenting class must not discriminate unfairly and must be "fair and equitable." 11 U.S.C. § 1129(b). CFG contends that the TSR Plan unfavorably discriminates against it by (1) allowing TSR to prepay the Class 4 unsecured creditors in full prior to paying CFG's claim, and (2) favorably treating First Bank at CFG's expense. Neither point is compelling. Concerning TSR's right to prepay the Class 4 creditors, the Court notes that the TSR Plan likewise allows TSR to prepay CFG. The right to prepay either class does not mean

TSR will. The Court infers that TSR would prepay a claim if it makes economic sense to do so. Why would TSR prepay its unsecured creditors and thus put itself in the position where it could not maintain payments to CFG? The same question can be posed concerning prepayment of CFG. CFG is granted a lien on 60% of TSR's issued stock. A failure to abide by the plan terms as to CFG obviously puts the majority of equity interest holders at risk of losing their respective interests in the company. On the other hand, it may make perfect sense to prepay one or the other of the unsecured creditors or CFG if TSR has the ability to do so without jeopardizing its ability to service its other ongoing obligations. The Court will not assume that TSR will make an irrational business decision.

Concerning the allegedly favorable treatment of First Bank relative to CFG, the Court notes the obvious: First Bank is a secured creditor and CFG is an unsecured creditor. "Unfair discrimination works only among claimants of equal nonbankruptcy priority." *See* 7 Collier on Bankruptcy ¶ 1129.03[3][b][ix] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see also In re Dow Corning Corp.*, 244 B.R. 705, 710–11 (Bankr. E.D. Mich. 1999), *aff'd in relevant part*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd in part and remanded*, 280 F.3d 648 (6th Cir. 2002), *cert. denied*, *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)* 537 U.S. 816 (2002) (an issue of unfair discrimination arises when there is a dissenting class with another class of the same priority). In addition, First Bank has made concessions regarding its treatment; its payments are significantly reduced. As discussed above, retiring the First Bank debt at the time the CFG balloon matures enhances the TSR Plan's feasibility. CFG dislikes the fact that First Bank will not simply call on the guaranty it has from Rogers (and presumably the other principals). Such guaranties continue during the term of repayment of the bank's indebtedness,

however. The Court knows of no authority, and has not been cited to any authority, that requires First Bank to first pursue recovery under its guaranties. It is entirely proper for the bank to consider its primary source of repayment to be TSR. In summary, the TSR Plan does not provide that other unsecured creditors are paid more or even sooner than CFG. The TSR Plan does not discriminate unfairly.

Section 1129(b)(2)(B)(i) provides that the treatment of a dissenting unsecured class is fair and equitable if such class "receive[s] . . . on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(B)(i). CFG submits that the proposed payout will not equal (or exceed) the "present value" of its claim. The question, then, is whether the interest rate will accord CFG the present value of its claim. Though no direct evidence was presented concerning interest rates, the Court can easily infer that a 5% rate will certainly satisfy the present value of CFG's claim, *if such payments are indeed made*. First Bank's note is 5.25%; it no doubt exceeds the prime rate, which both TSR and CFG submit is 3.75%. TSR contends it is simply paying the rate accorded the claim under the state court judgment. This rate, required by law and specifically by the state court judgment, satisfies the present value analysis, TSR submits. The timing of the judgment and the bankruptcy filing are proximate.

The Supreme Court of the United States in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), addressed the cramdown, present value analysis in the chapter 13 context.[4] The provision there, § 1325(a)(5)(B), provides that, with respect to a secured creditor, the chapter 13 plan may

---

[4]The term "cramdown" is simply a part of bankruptcy parlance that means the treatment of a creditor's claim, typically a secured claim, is enforceable over the creditor's objection. *See Till*, 541 U.S. at 468.

provide that the creditor retain its lien and receive deferred payments of a "value, as of the

effective date of the plan" that are "not less than the allowed amount of such claim."  The secured

claim in *Till* resulted from the bifurcation of the creditor's claim of $4,894.89 into a secured claim

of $4,000, the value of the truck which served as security for the debt, and an unsecured claim for

the remainder.  The finance charge on the account was 21%.  The secured portion of the claim

under the debtor's plan was set to accrue interest at 9.5%, which was 1.5% above the then-prime

rate.

> In defining the problem, the Supreme Court stated as follows:
>
> [a] debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore, is to choose an interest rate sufficient to compensate the creditor for these concerns.

*Till*, 541 U.S. at 474.

A plurality of the Supreme Court considered the four possible approaches used for

arriving at a rate that might satisfy the present value analysis as contemplated by Congress under

the Bankruptcy Code: the coerced loan approach, the presumptive contract rate approach, the

cost of funds approach, and the formula approach.  The formula approach is what the debtors'

plan proposed in *Till*.  The plurality adopted the formula rate as the beginning point and, in doing

so, rejected the other three approaches.  The coerced loan (or sometimes called a "forced loan")

approach looks to a rate the creditor would obtain if it foreclosed and sold the collateral and then

reinvested the funds in a loan of equivalent duration and risk.  This would require the bankruptcy

court and the parties to consider evidence of comparable loans to similarly situated non-debtors.

- 23 -

The district court in *Till* had approved such an approach and adopted the creditor's desired 21% rate. The presumptive contract rate is self-explanatory; the court and the parties look to the contract between the parties and the rate there as a starting point for finding the appropriate rate. The cost of funds approach looks to the *creditor's* cost of funds and, the Supreme Court noted, mistakenly focuses on the creditworthiness of the creditor rather than the debtor. *Id*. at 478.

As stated, the *Till* plurality adopted the formula or prime rate with risk-adjustment standard. The benefits of such approach are obvious. It is simple, objective, and minimizes the cost of litigating the issue. Left open under the *Till* standard is the proper risk adjustment. The plurality noted that such determination is made within the context of the bankruptcy court having decided that the debtor can indeed make the payments called for under the plan, the so-called feasibility finding.

The plurality said that there were three important principles that governed the choice of the proper approach as among the four, which obviously led to the formula rate. *Id*. at 474.

> First, the Bankruptcy Code includes numerous provisions that, like the cramdown provision, require a court to "discoun[t] ... [a] stream of deferred payments back to the[ir] present dollar value," to ensure that a creditor receives at least the value of its claim. We think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions. Moreover, we think Congress would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings. Second, Chapter 13 expressly authorizes a bankruptcy court to modify the rights of any creditor whose claim is secured by an interest in anything other than "real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). . . . Third, from the point of view of a creditor, the cramdown provision mandates an objective rather than a subjective inquiry. That is, although § 1325(a)(5)(B) entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cramdown loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cramdown terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the

very idea of a "cramdown" loan precludes the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose. Thus, a court choosing a cramdown interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose. Rather, the court should aim to treat similarly situated creditors similarly, and to ensure that an objective economic analysis would suggest the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default.

*Id*. at 474–76 (internal citations omitted).

Justice Thomas, who concurred in the judgment, issued a separate opinion, noting that the precise language of the statute does not require a rate reflecting an adjustment for risk:

The statute does not require that the value of the promise to distribute property under the plan be no less than the allowed amount of the secured creditor's claim. It requires only that "the value ... of property to be distributed under the plan," at the time of the effective date of the plan, be no less than the amount of the secured creditor's claim. Both the plurality and the dissent ignore the clear text of the statute in an apparent rush to ensure that secured creditors are not undercompensated in bankruptcy proceedings. But the statute that Congress enacted does not require a debtor-specific risk adjustment that would put secured creditors in the same position as if they had made another loan. It is for this reason that I write separately.

*Id.* at 485–86 (Thomas, J., concurring) (citations omitted). The plurality acknowledged Justice Thomas's point, but concluded "it too late in the day to endorse that approach now." *Id.* at 483.

The Fifth Circuit, in *In re Texas Grand Prairie Hotel Realty, L.L.C.*, No. 11-11109, 2013 WL 776317 (5th Cir. 2013), recently addressed the *Till* present value analysis. In *Texas Grand Prairie*, the debtor obtained confirmation of a chapter 11 plan over the objection of its major secured creditor, Wells Fargo. The plan provided that Wells Fargo's secured claim of $39 million was to be paid in deferred payments with interest accruing at 5% per annum. The debtors and Wells Fargo stipulated that the proper interest rate for achieving present value would be determined by applying the "prime-plus" formula endorsed by the plurality of the Supreme Court

in *Till*.  The district court affirmed the bankruptcy court's order.  The Fifth Circuit likewise affirmed, concluding that the bankruptcy courts are not tied to a specific methodology in assessing the appropriate chapter 11 cramdown rate of interest, and that, under the clear error standard of review, the bankruptcy court's approval of the 5% rate was not clearly erroneous.

The Fifth Circuit reviewed two of its prior decisions that preceded *Till*, *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 800 (5th Cir.1997), and *In re Smithwick*, 121 F.3d 211 (5th Cir.1997).  The Circuit noted that in *T-H New Orleans* it "'[declined] to establish a particular formula for determining an appropriate cramdown interest rate' under Chapter 11, reviewing the bankruptcy court's entire § 1129(b) analysis for clear error."  *Texas Grand Prairie*, 2013 WL 776317 at *4.  It then stated that in *Smithwick* it "held that bankruptcy courts must calculate the Chapter 13 cramdown rate using the 'presumptive contract rate' approach.  However, we reaffirmed that '[t]his court has declined to establish a particular formula for the cramdown interest rate in Chapter 11 cases.'"  *Id*.

The Circuit then addressed whether the prime-plus formula of the *Till* plurality was controlling.  *Id*.  It made the distinction that while the plurality in *Till* suggested that its prime-plus formula should also govern under chapter 11, it (the Fifth Circuit) has held that "[a] Supreme Court decision must be more than merely illuminating with respect to the case before us, because a panel of this court can only overrule a prior panel decision if such overruling is unequivocally directed by controlling Supreme Court precedent."  *Id*.  The Circuit noted that while many courts have chosen to apply the *Till* formula, they have done so "because they were *persuaded* by the plurality's reasoning, not because they considered *Till* binding."  *Id*.  The Circuit concluded, therefore, that the plurality's suggestion that its analysis applied to chapter 11 was not controlling

- 26 -

precedent.  *Id.*

As stated, the parties in *Texas Grand Prairie* stipulated that the *Till* prime-plus formula applied.  Regarding *Till*, the Circuit made several observations.  If using the *Till* plurality's formula method, a bankruptcy court begins its analysis with the prime rate and then adds a supplemental "risk adjustment" to account for "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."  *Id.* at *5.  It then noted that most courts have generally approved adjustments of 1% to 3%.  *Id.*

The Circuit recognized the "spirited dissent" of Justice Scalia in *Till* in which he stated that a 1.5% risk adjustment was obviously wrong, "not just off by a couple percent, but probably by roughly an order of magnitude."  *Id.* at *6.  Despite Justice Scalia's dissent, the Circuit recognized that the majority of bankruptcy courts have taken the *Till* plurality's invitation to apply the prime-plus formula under chapter 11.  The Circuit noted Footnote 14 where the plurality observed that a market rate approach might be more suitable in the chapter 11 context, as opposed to chapter 13.  *See id.* at *8.  This approach assumes a market in fact exists for a substantially similar loan.  Despite the possible application of a market-based rate for chapter 11 cases, the Fifth Circuit recognized that the *Till* plurality's formula approach had become the default rule in chapter 11 bankruptcies, as reflected in many cases that have addressed the issue. In conclusion, the Fifth Circuit stated as follows: "On this record, we cannot conclude that the bankruptcy court's cramdown rate calculation is clearly erroneous.  However, we do not suggest that the prime-plus formula is the only—or even the optimal—method for calculating the Chapter 11 cramdown rate."  *Id.* at *9.

The obvious difference between the present case and *Till*, as with the vast majority of

cases addressing this issue, is that here the Court is concerned with an *unsecured* claim. At first blush it appears that an unsecured creditor should receive a higher interest rate than a secured creditor, given the risk of non-payment. This analysis fails, however, when the relative risks of liquidation and confirmation are considered. A secured creditor's risk may increase given a debtor's continued use of the creditor's collateral. An unsecured creditor's prospects of repayment may indeed be enhanced if the debtor survives and the only other real alternative is liquidation. Such is the case here. If the TSR Plan fails, liquidation is likely with First Bank foreclosing its liens. Unsecured creditors, and specifically CFG, will receive no dividend on account of their claims. The risk that CFG will *not* be repaid is far greater upon liquidation. CFG did not bargain for a 5% rate, but there is clearly no market for a $900,000+ unsecured loan to an insolvent company. While there is arguably a risk component required for any present value analysis, there is no clear standard for setting the proper rate. Were this a consensual loan that was entered into shortly before the bankruptcy filing, use of the contract rate under a plan would be justified. *See Good v. RMR Invs., Inc.*, 428 B.R. 249 (E.D. Tex. 2010).

The Court has determined that the TSR Plan is feasible, albeit not without risk. The 5% rate on CFG's claim more than covers the risk of amortized payments relative to CFG's risk of non-payment that existed at the time of the judgment, at the time of the bankruptcy, and at the time of confirmation. Finally, the pledge of the three principals' stock to secure CFG puts CFG in a relatively better position, which position improves during the life of the plan: as secured debt is paid down, the company's value improves. Such improvement would therefore inure to the equity holders.

Though the 5% rate here was selected because it is the same as the judgment rate, it is a

rate that falls within the formula-plus rate of *Till*. Adopting such rate here satisfies the principles of the *Till* plurality: it sets an interest rate for purposes of § 1129(b)(2)(B) in a manner that is consistent with the present value requirement under chapter 13; it recognizes the debtor's ability under chapter 11 to modify the rights of unsecured creditors, *see* 11 U.S.C. § 1123(b)(5); and though the 5% rate results from a state court judgment rate, such judgment rate is in turn based on state law and is therefore based on an objective standard.

Neither the plurality nor Justice Thomas embraced a market-based approach. Justice Thomas held, and the plurality acknowledged, that the statute "may be read to support the conclusion that Congress did not intend the cramdown rate to include *any* compensation for the risk of default." *Till*, 541 U.S. at 483.

The Court, though not bound by the *Till* plurality, finds the *Till* plurality, with Justice Thomas's concurrence, persuasive. As the Fifth Circuit noted in *Texas Grand Prairie*, "the *Till* plurality's formula approach . . . has become the default rule in Chapter 11 bankruptcies." *Texas Grand Prairie*, 2013 WL 776317, at *8. The Circuit further noted that "[a]mong the courts that follow *Till*'s formula method in the Chapter 11 context, 'risk adjustment' calculations have generally hewed to the plurality's suggested range of 1% to 3%." *Id.* at *6. *Till* approved an adjustment rate of 1.5%, and *Texas Grand Prairie* approved a risk adjustment rate of 1.75%. The rate here is 1.25% above the prime rate. As compared to *Till* and many of the cases that have addressed the issue, the percentage increase here is significantly greater. Finally, in adopting the judgment rate, the TSR Plan satisfies the purpose of post-judgment interest under state law, which purpose is not dissimilar to the *Till* present value analysis. Post-judgment interest is not intended to punish a judgment debtor; it is to compensate the judgment creditor for the "lost

opportunity to invest the money awarded as damages at trial." *Miga v. Jensen*, 96 S.W.3d 207, 212 (Tex. 2002). The 5% rate accords CFG the present value of the stream of payments to be made in satisfaction of its unsecured claim.

## B.    Confirmation of the Wilson Plan

CFG objects to the Wilson Plan on the basis that the Wilson Plan, like the TSR Plan, fails to comply with all of the applicable requirements of § 1129(a) as well as the standard for confirmation under § 1129(b). The § 1129(b) objection is based on the Wilson Plan's failure to satisfy the absolute priority rule. This point is raised because the Wilson Plan obviously does not provide for payment in full at the time of confirmation of all unsecured creditors, particularly CFG. Section 1129(b)(2)(B)(ii) provides that the holder of any claim that is junior to the claims of creditors in the class of unsecured creditors may not retain any property. For an individual debtor, this means such individual cannot retain estate property.[5] The absolute priority rule is clearly violated *if it applies*.

CFG submits that the Wilson Plan fails to satisfy the following § 1129(a) requirements: the good faith requirement, § 1129(a)(3); the best interest test—that non-accepting creditors receive at least what they would receive upon a chapter 7 liquidation, § 1129(a)(7); feasibility, § 1129(a)(11); and acceptance by at least one impaired, non-insider class, § 1129(a)(10). The Court is satisfied that the Wilson Plan satisfies the good faith, feasibility, and acceptance requirements. The best interest of creditors test is problematic in light of the value being paid by Hilliard for a 40% interest in TSR. The plan must attribute at least some value to Wilson's

---

[5]To be clear, the statute provides that as a general rule the debtor may not retain any property, but for a debtor that is an individual, the "debtor may retain property included in the estate under section 1115 " of the Bankruptcy Code. 11 U.S.C. § 1129(b)(2)(B)(ii).

interest in TSR, under the circumstances.

The Court briefly addresses the § 1129(b) absolute priority rule. As indicated, the question is not whether it is violated, the question is whether it applies. As any bankruptcy practitioner knows, the absolute priority rule is a bedrock principle of chapter 11 practice. The issue of whether it applies arises from the 2005 amendments to the Bankruptcy Code, particularly the amendment to § 1129(b)(2)(B)(ii), which clearly provides some level of exception to the rule—*see supra* note 5; and the additions of §§ 1115 and 1129(a)(15). Section 1129(a)(15) is a provision taken from chapter 13 of the Bankruptcy Code which requires that, in an individual chapter 11 case, a debtor must, generally, dedicate all his disposable income for payment to creditors during the life of the plan. This requirement is fundamental to confirmation of a *chapter 13 plan* and is considered the trade-off to chapter 13 debtors not having a requirement of absolute priority. It is therefore being argued, and in some corners perhaps being assumed, that the absolute priority rule does not apply to individual chapter 11 debtors who dedicate all disposable income to their plan as required by § 1129(a)(15).[6] The Wilson Plan does indeed provide that they are dedicating all their disposable income.

The Court will not attempt here to resolve this debate, but will note that courts are split on the issue. *See* 7 Collier on Bankruptcy ¶ 1129.04[3][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Such cases more than adequately set forth the arguments on both sides of the question. Having reviewed the cases and the arguments made, the Court simply concludes that it finds the better reasoned cases to be those that conclude the absolute priority rule has not been abrogated in individual chapter 11 cases. *See In re Maharaj*, 681 F.3d 559 (4th Cir. 2012); *In re*

---

[6]The analysis turns on a court's construction of § 1115 of the Code.

*Lively*, 467 B.R. 884 (Bankr. S.D. Tex. 2012).  The Court notes that this issue is presently before the Fifth Circuit upon a direct appeal taken from the court's decision in the *Lively* case.

In light of the Court's conclusion, even were it to find that all necessary requirements of § 1129(a) are satisfied, it must deny confirmation of the Wilson Plan given the Wilson Plan's failure to satisfy the absolute priority rule.

## Conclusion

The Court concludes that the TSR Plan satisfies the necessary requirements for confirmation under §§ 1129(a) and (b) of the Bankruptcy Code.  As stated, the Court concludes that confirmation of the Wilson Plan must be denied.

### End of Memorandum Opinion ###